[Cite as *State v. Hubbard*, 2024-Ohio-1315.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2023-01-014 |
| | : | O P I N I O N |
| - vs - | | 4/8/2024 |
| | : | |
| CHRISTOPHER JAMES HUBBARD, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 20 CR 37550

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Timothy J. McKenna, for appellant.

**BYRNE, J.**

{¶ 1} Christopher James Hubbard appeals his convictions for felonious assault and assault on a police dog and the sentence imposed on those and other convictions. For the reasons discussed below, we affirm.

**I. Factual and Procedural Background**

{¶ 2} In December 2020, a Warren County grand jury indicted Hubbard on 11 counts, consisting of three counts of attempted aggravated murder, three counts of felonious assault, one count of failure to comply with an order or signal of a police officer, two counts of weapons under disability, one count of improperly handling firearms in a motor vehicle, and one count of assault of a police dog. The alleged victims of the three attempted aggravated murder counts and the three felonious assault counts were Middletown Police Officer Dennis Jordan, Butler County Sheriff's Deputy Mike Barger, and Ohio State Highway Patrol Trooper Brett Lee.

{¶ 3} The three counts of attempted aggravated murder and the three counts of felonious assault each included three firearm specifications: a seven-year specification for discharging a firearm at a peace officer; a five-year specification for discharging a firearm from a motor vehicle, and a three-year specification for having a firearm on or about his person or under his control while committing the offense and displaying, brandishing, indicating possession of, or using the firearm to facilitate the offense. The one count of failure to comply also included a one-year specification for having a firearm on or about his person or under his control while committing the offense.

{¶ 4} This indictment arose from an incident in which Hubbard, who had threatened to "shoot it out" with police, led multiple police agencies on a vehicle chase. At the conclusion of the chase, Hubbard concealed himself in his stationary vehicle and would not comply with officers' commands to surrender. Law enforcement deployed a bean bag gun and a K9 in a less-than-lethal attempt to extract Hubbard from the vehicle. When the K9 approached the vehicle, Hubbard fired five shots from the vehicle towards a group of officers, striking one of them. The matter proceeded to trial. We will summarize the key trial testimony below.

**A. State's Case**

**1. Officer Dennis Jordan's Testimony**

{¶ 5} Officer Dennis Jordan testified that he was a Middletown, Ohio police officer and worked in the patrol division. He was also a K9 handler, working alongside his K9, "Koda." Officer Jordan was trained in using Koda to extract suspects from vehicles.

{¶ 6} Several days before the incident, Officer Jordan received an email from a detective concerning Hubbard. The email stated that Hubbard had warrants for his arrest and that Hubbard had made a comment to a parole officer about not going back to prison and that he would "shoot out" with police to avoid prison.

{¶ 7} On August 31, 2020, Officer Jordan was at a training facility when he was notified that Hubbard's cell phone had been pinging in Middletown. Officer Jordan left the facility to respond in his police cruiser. While responding, he learned that Hubbard's vehicle was at that time involved in a police chase. Officer Jordan eventually joined that chase.

{¶ 8} During the pursuit, Hubbard's vehicle was successfully stop-sticked by another law enforcement officer. Soon after, Hubbard stopped his vehicle in the grass in front of a residence located at 2617 North Mason Montgomery Road.

{¶ 9} Upon Officer Jordan's arrival at 2617 North Mason Montgomery Road, he positioned his cruiser behind and to the left of Hubbard's vehicle, pointed in the same direction as Hubbard's vehicle. At that time, he observed Hubbard's window roll down. He recalled Hubbard sticking his hands out of the window for a second, then pulling his hands back in, and rolling the window up. Hubbard repeated this action " a couple times."

{¶ 10} During this time, numerous law enforcement officers who had been involved in the chase were repeatedly ordering Hubbard to surrender. However, Hubbard did not respond to those commands and remained in the vehicle. Officer Jordan decided that because Hubbard was not demonstrating an intent to surrender, he would use Koda to

extract Hubbard from the vehicle.

{¶ 11} Butler County Sheriff's Deputy Mike Barger was standing alongside Officer Jordan at Officer Jordan's cruiser. Officer Jordan informed Deputy Barger of his plan to use Koda to extract Hubbard. He instructed Deputy Barger to get the less-than-lethal bean bag shotgun out of Officer Jordan's police cruiser. This shotgun was distinctive in that it had a bright orange synthetic stock. The plan was for Deputy Barger to shoot at the front driver's side window of Hubbard's vehicle to damage the glass, so that Koda could then enter the vehicle and extract Hubbard.

{¶ 12} As part of the plan to extract Hubbard, Officer Jordan moved his cruiser closer to Hubbard's vehicle. He explained that he did this so that Deputy Barger could have a better angle for shooting the bean bag gun at the window.

{¶ 13} Photographs introduced at trial show that at its final parked position, the front of Officer Jordan's cruiser remained positioned behind and approximately two car widths to the left of Hubbard's vehicle. That is, the front end of the police cruiser was positioned roughly even with the rear bumper of Hubbard's vehicle. So, if Hubbard was to look at the front of Officer Jordan's cruiser from the front or back driver-side seat of Hubbard's vehicle, Hubbard would be required to look to the left, and behind him.

{¶ 14} After moving the cruiser closer, Officer Jordan then got out and kneeled alongside the vehicle's left front bumper, with Koda. Deputy Barger was positioned immediately to Officer Jordan's right, and another law enforcement officer—State Highway Patrol Trooper Brett Lee—was positioned immediately to Deputy Barger's right.

{¶ 15} Officer Jordan then began giving commands to Hubbard to surrender, alerting Hubbard that he would be releasing his K9 and that if he did release the K9, Hubbard would be bit. Hubbard gave no signs of compliance after Officer Jordan announced these commands. Officer Jordan noted that the windows were rolled up on Hubbard's vehicle

- 4 -

and he could not see into the vehicle.

{¶ 16} Deputy Barger then fired the bean bag gun. Immediately after the bean bag gun fired, Officer Jordan released Koda. Officer Jordan then (in what he would describe as a "tactical error") stood up, out of cover, to get a better vantage on what Koda was doing.

{¶ 17} Officer Jordan observed the front driver-side window of Hubbard's vehicle "splinter" from the bean bag round. Koda then went up and hit the window, knocking the rest of the window out, which caused Koda to fall back onto his hind legs. As Koda was jumping back into Hubbard's vehicle, Officer Jordan stated he felt as if an invisible man had just punched him as hard he could in his left shoulder. He then felt a "tug" on his right thigh. Officer Jordan then realized that he had been shot. He dove to the ground and took cover. He recalled hearing the rapid gunfire of officers returning fire.

{¶ 18} The bullet that hit Officer Jordan's shoulder went through the front of his shoulder and exited his triceps. The other bullet hit his thigh holster, which shattered, slicing his right hand.

**2. Deputy Barger's Testimony**

{¶ 19} Deputy Barger testified that he was sitting in a gas station parking lot when he joined the chase. He observed Hubbard drive by. Hubbard appeared "very stoic." During the chase, Deputy Barger was advised that Hubbard had said that he would not be "taken alive."

{¶ 20} At 2617 North Mason Montgomery Road, the location where Hubbard stopped his vehicle, Deputy Barger was focused on Hubbard in the vehicle. He recalled seeing something he thought were keys or "something else" in Hubbard's hands. He saw Hubbard throw some "items" out of the car and then roll up his window.

{¶ 21} Officer Jordan told him to grab his bean bag gun and he did so. As Officer Jordan pulled his vehicle closer to Hubbard's vehicle, Deputy Barger remained focused on

Hubbard. He now could not see Hubbard because Hubbard had concealed himself, either by reclining or by moving to the back seat.

{¶ 22} Deputy Barger recalled firing the bean bag gun at the front window of the vehicle, which shattered. After that, he recalled seeing movement in the back seat. Officer Jordan then released the K9. Deputy Barger had a "blank spot" in his memory as to what occurred next. The next thing he recalled was getting up from his knees, "getting rid of the shotgun," and then "deploying my service pistol and engaging into the vehicle."

### 3. Trooper Brett Lee's Testimony

{¶ 23} Trooper Brett Lee testified that he deployed the stop sticks that successfully deflated Hubbard's vehicle's tires. At the scene, he positioned himself on the side of Officer Jordan's police cruiser. He was positioned to the right of a Butler County Sheriff's Deputy (Deputy Barger). A Middletown police officer (Officer Jordan) was positioned to the deputy's left.

{¶ 24} Trooper Lee testified that as the K9 approached the driver's window of the vehicle, he observed the rear driver's side window break outward and observed shots being fired from this window. He recalled thinking, "I'm being shot at." Trooper Lee returned fire and took cover. He then saw Officer Jordan face down on the ground, not moving. Trooper Lee radioed "shots fired" and "officer down."

### 4. Detective Jacob Hauer's Testimony

{¶ 25} Detective Jacob Hauer was on scene during the shooting and was positioned at the trunk of Officer Jordan's cruiser. While looking into Hubbard's vehicle, he witnessed a "lot of hand movement." He believed he saw Hubbard waving a cell phone around. He also saw Hubbard throw out "random items" from the vehicle, including an object that was possibly a lanyard.

{¶ 26} Detective Hauer saw Hubbard stick his hands out of the vehicle for a "very

brief second" before his hands went back inside the vehicle where Detective Hauer could not see them. During the time that Hubbard was in the vehicle, he observed "a lot of movement," including Hubbard's "body moving, shoulders dipping, head going down, hands moving, furtive movements."

{¶ 27} When Officer Jordan pulled his cruiser closer to Hubbard's vehicle, Detective Hauer continued to observe Hubbard throw items out of the vehicle, and furtive movements. Then he saw Hubbard recline his seat back and he could no longer view him. Hubbard was trying to conceal himself.

{¶ 28} When the K9 approached the vehicle, Detective Hauer observed the rear driver's side window shatter and he heard gunshots. He saw a hand holding a handgun and firing it in the direction of the law enforcement officers positioned towards the front of Officer Jordan's police cruiser.

### 5. Sergeant Jason Rosser's Testimony

{¶ 29} From his vantage point on scene, Butler County Sheriff's Department Sergeant Jason Rosser observed Hubbard looking back behind him, using the driver's side mirror to see what the responding officers were doing. He observed Hubbard fire from the vehicle and observed the gun firing. Hubbard was firing towards the officers positioned at the front of Officer Jordan's cruiser. Hubbard was "sweeping" the gun, meaning that he was moving the gun back and forth while firing.

### 6. Asan Dixon's Testimony and Video Recording

{¶ 30} Asan Dixon, a roofer doing work in the area, observed the police chase and decided to follow it, ultimately stopping near the scene of the shooting. He video-recorded the shooting using his cell phone. The state played Dixon's video at the trial. The video captures audio of the firing of the bean bag round. Two to three seconds later, Koda runs at the vehicle and makes a single leap towards Hubbard's window and does not enter the

vehicle. At the same time Koda hits the window, shots are fired from Hubbard's vehicle's rear driver's side window, blowing out the glass. Then officers return fire.[1]

### 7. Special Agent Chad Holcomb's Testimony

{¶ 31} Special Agent Chad Holcomb testified that he worked for the Ohio Bureau of Criminal Investigation and worked specifically in crime scene processing. He participated in the post-shooting investigation.

{¶ 32} Special Agent Holcomb testified that law enforcement recovered a lanyard outside of Hubbard's vehicle. However, the key to the vehicle was in the vehicle's ignition, not attached to the lanyard. Police also recovered two firearms in the vehicle. One was a pink Taurus 380, which was loaded with five cartridges. The gun used by Hubbard in the shooting was a Ruger nine-millimeter, which was recovered in the back seat of the vehicle. There were 12 cartridges in the magazine of the Ruger and an investigation revealed that Hubbard fired the Ruger five times.

### 8. Cynthia Holloway's Testimony

{¶ 33} Cynthia Holloway testified that Hubbard was the father of her grandson. He spent "a lot" of time at her home in the months leading up to the shooting. During this time, and on at least seven or eight occasions, Hubbard told her that he was not going back to prison. He said that he would do "whatever it took" to avoid prison, including specifically stating he would shoot it out with police or commit suicide by police.

{¶ 34} About a week prior to the incident, Hubbard asked Holloway to tell his children what kind of person he was if he was in a shootout with police. She believed that he sounded serious. He also informed her that he was in possession of firearms.

{¶ 35} On August 31, 2020, Holloway received a voicemail from Hubbard. On the

---

1. The state also introduced a "dash cam" recording from Trooper Lee's police vehicle, which captured the shooting from a different angle, but with less clarity than Dixon's video.

voicemail, Hubbard made a statement to the effect that he would have a shootout with police until he was dead.

{¶ 36} During Holloway's testimony, the state played a recorded jail call in which a man associated with Holloway's daughter spoke to Hubbard. This conversation occurred on July 18, 2020. On it, Hubbard told the man that he was going to shoot it out with police the next time they attempted to put cuffs on him and that he was not "playing." Holloway said that the statements Hubbard made to the man on the recorded call were similar to statements Hubbard had made to her in the weeks leading up to the shooting.

**9. Parole Officer Antonio Miller's Testimony**

{¶ 37} Parole Officer Antonio Miller testified that he was a parole officer with Ohio's Adult Parole Authority. Between July 2020 and August 2020, he was the parole officer responsible for supervising Hubbard. Parole Officer Miller stated that he attempted to meet with Hubbard and visited an address listed for him but instead found Hubbard's cousin, who indicated Hubbard did not live at that address. Parole Officer Miller left a card and asked Hubbard's family to request that Hubbard contact him.

{¶ 38} Parole Officer Miller testified that Hubbard made no attempts to communicate with him until August 2020, when Hubbard finally called him. On that phone call, Hubbard indicated that he had heard that Parole Officer Miller was looking for him. Parole Officer Miller asked Hubbard to come in but Hubbard stated that he had a warrant. Parole Officer Miller attempted to convince Hubbard to come in, but Hubbard was resistant. Hubbard told Parole Officer Miller that he had spent many years in prison and he was not going back. Hubbard told Parole Officer Miller that if he did come into contact with police, he would "shoot it" with police. Parole Officer Miller testified that Hubbard was calm and "very matter of fact" when he said this and that Parole Officer Miller took the comment seriously.

{¶ 39} Parole Officer Miller then contacted a police detective who he knew wanted

to question Hubbard about a homicide. He informed the detective of what Hubbard had said about not going to prison and shooting it out with police. That detective then put out a "be on the lookout" notice for Hubbard.

{¶ 40} Parole Officer Miller's telephone call with Hubbard occurred just a few days before the shooting incident.

### B. Defense Case

### 1. Steven Howard's Testimony

{¶ 41} Hubbard elicited testimony from Steven Howard, a shooting incident reconstruction and investigations expert. Howard reviewed videos, a number of reports, and photographs of the crime scene. He also examined Hubbard's vehicle. Based on his review and primarily based upon his review of the video recordings of the incident, Howard opined that Hubbard was shooting at Koda—the police dog—not at Officer Jordan. Howard believed that the shooting was reactive to the dog attempting to enter the vehicle, rather than an attempt to shoot at police officers.

### 2. Hubbard's Testimony

{¶ 42} Hubbard testified that he experienced sexual and physical abuse as a child. He also experienced violence in the household. He stated that because of his history of trauma, he reacted to threats differently than others.

{¶ 43} Hubbard testified that he had recently been the victim of gun violence. That is, approximately 18 months before the shooting, he was the victim of a robbery in Cincinnati where two "guys" tried to rob him. During that robbery attempt, he was in the driver's seat of the vehicle with the "seat up." He grabbed a gun that was aimed "right by my face" and "jerked the gun low" and was ultimately shot in the femur. Hubbard called 9-1-1 and when officers responded, they approached him at gun point and cuffed him, as if he was the "bad guy."

{¶ 44} Hubbard admitted he had been in and out of prison his entire life. He was 17 years old when he first went to prison for 18 months, for receiving stolen property. In prison, he experienced violence.

{¶ 45} Hubbard was released from prison on April 19, 2020. He testified that after leaving prison, he was attempting to live a law-abiding life. Hubbard stated that on the date of the shooting, August 31, 2020, he was unaware of any outstanding parole violation. He denied that Parole Officer Miller had warned him about any parole warrants. He stated he had not committed any crimes for which he was being investigated.

{¶ 46} Hubbard did admit that after he was released from prison, he felt uneasy about interactions with police and "police brutality" in particular. He cited the nationally publicized incidents that occurred in 2020 involving George Floyd and Jacob Blake. He stated that these incidents increased his uneasy feeling about police.

{¶ 47} Hubbard admitted stating that he would not be killed in handcuffs but stated that he did not mean that he was going to "start something." As to the recorded jail call in which he stated that he would shoot it out with police, he explained that his statement was all bravado. He denied any intent to engage in a shoot-out with police, and stated that he was just explaining that he does not like bullies or "abuse-of-power guys."

{¶ 48} Hubbard testified that on August 31, 2020, he woke up late. He was in Middletown and he had planned to go to Somerville, Ohio to spend time with his son and a non-biological child whom he was taking care of. The plan was to catch lightning bugs and build a bonfire.

{¶ 49} Hubbard left for Somerville and was driving on Route 4, headed towards Hamilton. He was sitting in traffic when a marked police SUV pulled up to him aggressively. The SUV had its lights and sirens on. Hubbard then "very slowly hit the gas" and "pulled outta there." He "wasn't stopping there, where [police] picked to stop." He explained that

he needed to make some phone calls because he thought he might die. In explaining why he thought he might die, Hubbard stated that he knew he had two guns in the vehicle and he was on parole. He could not throw the guns out of the vehicle because, "they might kill me." In addition, he thought that throwing the guns out would bring a new charge of tampering with evidence. Hubbard decided that he was not going to stop for police until he found somewhere "safe" and so that he could finish the phone calls he planned to make.

{¶ 50} Hubbard testified that when he eventually pulled over, he reclined his seat because the last time he got shot he was in the front seat of the vehicle. He stated he tried to surrender to police by placing his hands outside of the window. However, he said, the police were not communicating with him whatsoever, and they would not arrest him. The only person who was communicating with him at the time was the 9-1-1 dispatcher, and he was telling that person to tell police not to shoot him.

{¶ 51} Hubbard stated that the video recordings of the incident did not accurately depict his hands being outside of the vehicle. He stated he threw the lanyard out of the vehicle and thought it had the key on it, but he must have broken it.

{¶ 52} Hubbard stated that he was on the 9-1-1 call with his hands up when the first shot occurred. He then "reacted," and it was like a "reflex." That first shot cut his face and sliced his hand open. That was when the phone left his hand. Hubbard looked out of the vehicle and saw the K9 coming, and that was when he grabbed his gun. He thought the dog was coming to get him, and he thought he shot the dog. When he was shooting, he testified, he had no plan to kill police officers. He said that he was just trying to protect himself.

{¶ 53} On cross-examination, Hubbard denied that he ever told Parole Officer Miller that he would shoot it out with police.

### 3. Lisa Petrey's Testimony

{¶ 54} Lisa Petrey testified that she was a licensed social worker in Ohio, and the court recognized her as an expert in the field of "mental health as a licensed social worker."

{¶ 55} Petrey testified regarding post-traumatic stress disorder ("PTSD"). According to Petrey, PTSD causes those who suffer from it to engage in hypervigilance and exaggerated responses to events. It occurs when a person is exposed to "some sort of trauma and you are reminded of that."

{¶ 56} Petrey testified that she counseled Hubbard for seven- and one-half months while he was in the Warren County Jail. He came to her because he was having nightmares and anxiety and he was getting in trouble while residing in the jail pods.

{¶ 57} Petrey believed that Hubbard suffered from PTSD and that he had suffered PTSD since his childhood. She explained that he was constantly in fear of his safety. Petrey believed that on August 31, 2020, the bean bag gun shot and the dog jumping triggered Hubbard's PTSD.

{¶ 58} Petrey stated that she no longer worked for the company that contracted to provide counseling services to inmates at the Warren County Jail. She was fired by her employer after the prosecutor filed a complaint against her license. She said that a board investigation revealed that any allegations of misconduct were "unsubstantiated." She was not being paid to testify for Hubbard.

{¶ 59} On cross-examination, Petrey stated that Hubbard was the person who had told her that he had been diagnosed with PTSD. Petrey also admitted that she did not verify any of the information Hubbard told her in therapy.

{¶ 60} Also on cross-examination, Petrey confirmed that she had not listened to the voicemail that Hubbard left for Holloway. Hubbard had not told Petrey about telling Holloway multiple times that he would shoot it out with police. Hubbard also did not tell her about stating to Parole Officer Miller that he would shoot it out with police. And he did not

tell Petrey about the recorded jail call in which he stated he would shoot it out with police.

### C. State's Rebuttal Witnesses

{¶ 61} The state submitted the testimony of two witnesses to rebut Hubbard's and Petrey's claim that Hubbard suffered from PTSD.

### 1. Dr. Kara Marciani's Testimony

{¶ 62} Dr. Kara Marciani testified that she held a doctorate in clinical psychology and was board certified in forensic psychology. The court recognized her as an expert in the field of forensic psychology.

{¶ 63} Dr. Marciani stated that in assessing a defendant, she was required to verify everything the defendant claimed, because she operated under the presumption that people tend to lie or present themselves favorably in her evaluations.

{¶ 64} The state requested that she assess Hubbard to determine if he suffered from PTSD. She spoke with Hubbard for three hours on September 17, 2022. Hubbard did not indicate any learning disabilities or that he suffered from delusions. Dr. Marciani believed Hubbard was capable of relaying information about himself.

{¶ 65} During their conversation, Hubbard denied having any history of mental health issues. However, Hubbard was very intent on telling Dr. Marciani that he suffered from PTSD. But when asked about his symptoms, Hubbard only relayed that he had nightmares and discussed an incident that occurred in 2018. (Perhaps this was the robbery incident Hubbard described during his testimony, but Dr. Marciani did not clarify.) He told her that the nightmares had resolved.

{¶ 66} Hubbard asserted that he had PTSD and attempted to convince her that he had PTSD, but he could not justify his PTSD claims based on the symptoms he explained to her.

{¶ 67} Dr. Marciani did believe that Hubbard had antisocial personality disorder.

People with this disorder tend to be very manipulative and display a disregard for social norms concerning lawful behavior.

{¶ 68} Dr. Marciani further noted that she reviewed Hubbard's records from his time in the custody of the Ohio Department of Corrections ("ODRC"). During his time in prison, he had never been on a mental health caseload. And he in fact asserted to ODRC that he did not need mental health treatment while in prison. But in September 2020, Hubbard requested to speak to someone at ODRC about mental health. He did so but could not produce any symptoms.

{¶ 69} Dr. Marciani's opinion was that Hubbard did *not* have PTSD. Dr. Marciani also criticized Petrey's opinion. Specifically, she noted that the assessment tool used by Petrey was not an assessment tool for PTSD.

### 2. Dr. Carla Dreyer's Testimony

{¶ 70} Dr. Carla Dreyer testified that she was a psychologist and worked for the Forensic Evaluation Service Center in Butler County. The court recognized Dr. Dreyer as an expert in forensic psychology.

{¶ 71} The court ordered Dr. Dreyer to evaluate Hubbard in September 2021 for the purpose of assessing his competency to stand trial. When she interviewed Hubbard, he presented to her with an underlying personality disorder and was "very manipulative." He attempted to manipulate her during this evaluation.

{¶ 72} Dr. Dreyer testified that Hubbard repeatedly emphasized his belief that he suffered from PTSD. However, he never displayed the symptoms that would be necessary for her to diagnose PTSD. He was invested in the idea of PTSD and was "very clear" to her that he wanted to use PTSD as a defense in his criminal case. She explained to him that she was only there to evaluate him for competency.

{¶ 73} Dr. Dreyer asked Hubbard to describe the day of the offense. He stated he

was with a woman with whom he had a sexual relationship. He left the woman to go to a studio to make rap music. On the way to the studio, he was surrounded by police. He told her that he knew he was going to be arrested and started contacting people to let them know he would be arrested.

{¶ 74} Dr. Dreyer evaluated Hubbard a second time in October 2022. This time she evaluated him to determine his mental status at the time of the offense. During this interview, Hubbard again repeatedly emphasized that he had PTSD. However, he still did not endorse any symptoms meeting the clinical criteria for PTSD.

{¶ 75} In explaining what occurred during the shooting, Hubbard stated that he put his hands near the crack of the window, with his phone in his hands, and then officers began shooting at him. He admitted firing his gun, but said he did not remember doing so.

{¶ 76} Dr. Dreyer criticized Petrey's opinion and written report. She said Petrey's report was concerning because she was offering a forensic opinion as well as treating Hubbard as a therapist. Dr. Dreyer believed that Petrey's report and opinion was biased based on her being involved in a therapist-patient relationship with Hubbard.

{¶ 77} Dr. Dreyer also criticized Petrey because she based her opinion on Hubbard's therapy sessions and his version of events which suggested that he was fearful of police. Dr. Dreyer noted that Petrey had not gone through the proper clinical criteria to diagnose PTSD and did not reference the "DSM-5" criteria. Finally, Dr. Dreyer noted that Petrey failed to consider Hubbard's substance abuse or personality disorder in arriving at her opinion.

**D. The Verdict and Sentencing**

{¶ 78} The jury found Hubbard guilty of the three counts of felonious assault as well as the specifications attached to those counts. The jury also found Hubbard guilty of failure to comply and its specification, having weapons under disability, improperly handling firearms in a motor vehicle, and assault on a police dog. The jury found Hubbard not guilty

of the three counts of attempted aggravated murder.

{¶ 79} The trial court sentenced Hubbard to consecutive sentences on the felonious assault counts and the first specifications to those counts. The court also ordered consecutive sentences on the failure to comply count and its specification, as well as the weapons under disability count. The court imposed concurrent sentences on the remaining counts of improper handling of a firearm in a motor vehicle and assault on a police dog. In total, the court imposed a prison term of a minimum of 56 years to a maximum of 61- and one-half years in prison.

{¶ 80} Hubbard appealed, raising four assignments of error, which we will address in turn.

## II. Law and Analysis

### A. Sufficiency and Manifest Weight of the Evidence

{¶ 81} Hubbard presents his first and second assignments of error collectively.

{¶ 82} Hubbard's first assignment of error states:

> THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT AS THERE WAS INSUFFICIENT EVIDENCE TO CONVICT.

{¶ 83} Hubbard's second assignment of error states:

> THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT BECAUSE THE MURDER AND FELONIOUS VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 84} Hubbard challenges the guilty verdicts for felonious assault and assault on a police dog.[2] He contends that the state did not produce sufficient evidence to convict him and that the jurors lost their way in convicting him because the greater weight of the

---

2. Hubbard does not challenge the guilty verdicts on the remaining counts, though he challenges his sentence as a whole in his fourth assignment of error.

evidence demonstrated that he acted in self-defense. He also contends that the state submitted insufficient evidence that he attempted to assault Deputy Barger and Trooper Lee.

**1. Applicable Law – Sufficiency and Manifest Weight of the Evidence**

{¶ 85} When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205 ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 86} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 87} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest

weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 12th Dist. Clinton No. CA2020-06-007, 2021-Ohio-466, ¶ 15.

{¶ 88} "Although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, '[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency.'" *State v. Billingsley*, 12th Dist. Butler Nos. CA2019-05-075 and CA2019-05-076, 2020-Ohio-2673, ¶ 15, quoting *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ 89} We pause here to note that because self-defense is an affirmative defense, it is not considered in a sufficiency of the evidence analysis. *State v. Ballein*, 12th Dist. Fayette No. CA2021-10-022, 2022-Ohio-2331, ¶ 32. This is because an affirmative defense does not negate the legal adequacy of the state's proof of an offense for purposes of submitting it to a jury. *Id*. That is, an affirmative defense does not deny the existence of a critical element of a given offense. *See id*. Instead, it provides the legal justification for having committed the offense. *Id*. The inapplicability of a sufficiency-of-the-evidence review in assessing a self-defense claim remains the same despite the General Assembly having enacted the current version of R.C. 2901.05, which shifted the burden of proof to the state to disprove self-defense. *Id*. at ¶ 33-36. Accordingly, as it relates to Hubbard's self-defense argument, we do not review his convictions for the sufficiency of the evidence and instead focus only on the manifest weight of the evidence.

### 2. State's Burden to Disprove Self-Defense

{¶ 90} The jury convicted Hubbard of felonious assault on a police officer, in violation of R.C. 2903.11(A)(2). For the offense of felonious assault, the state was required to prove that Hubbard knowingly "cause[d] or attempt[ed] to cause physical harm to another * * * by

means of a deadly weapon or dangerous ordnance."

{¶ 91} The jury also convicted Hubbard of assaulting a police dog in violation of R.C. 2921.321(A)(1). For that offense, the state was required to prove that Hubbard knowingly "cause[d], or attempt[ed] to cause, physical harm to a police dog * * * in * * * the following circumstance[] * * * The police dog * * * is assisting a law enforcement officer in the performance of the officer's official duties at the time the physical harm is caused or attempted."

{¶ 92} In cases involving the use of deadly force, the elements of a valid claim of self-defense are (1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused had a bona fide belief that he was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of such force; and (3) the accused did not violate any duty to retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002); *State v. Towson*, 12th Dist. Warren No. CA2021-08-069, 2022-Ohio-2096, ¶ 24.

{¶ 93} A statute, R.C. 2901.05(B)(1), provides that when "there is evidence presented that tends to support that the accused person used the force in self-defense * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *." In other words, the state must disprove one of the elements of self-defense beyond a reasonable doubt. *State v. McFarland*, 12th Dist. Butler No. CA2021-05-053, 2022-Ohio-2326, ¶ 42, citing *State v. Byrd*, 12th Dist. Warren No. CA2019-07-073, 2020-Ohio-3073, ¶ 23.

{¶ 94} In *McFarland*, we restated the state's burden as follows:

> the state is required to disprove self-defense by proving beyond a reasonable doubt that [the defendant] (1) was at fault in creating the situation giving rise to the affray, or (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only

- 20 -

means of escape, or (3) violated a duty to retreat or avoid the danger. *See Byrd* at ¶ 23. The state need prove only one of these elements to disprove that a defendant acted in self-defense. *Id.*

*Id.* at ¶ 43.

{¶ 95} Hubbard contends that the state failed to prove that he was at fault in creating the situation that gave rise to the affray. He states that he was attempting to surrender to police while in his vehicle and police elevated the situation by using excessive force, i.e., by deploying a bean bag gun and a K9.

{¶ 96} We disagree that the state failed to prove that Hubbard was at fault in creating the situation that gave rise to the shooting. The state's evidence was that before the incident, Hubbard repeatedly made statements to various witnesses who testified at trial that he was not going to go back to prison and that he would shoot it out with police if he encountered them. When police then attempted to stop Hubbard while in traffic, he refused to stop and instead led police on an approximate 28-mile chase that ended when police successfully deployed stop sticks and disabled his vehicle. Hubbard then chose to pull into the yard of a residence, potentially exposing the residents of that home to his pre-planned police shoot-out. When Hubbard's vehicle was stopped, the evidence was that he rolled down his window and threw items out of the car. But he never made any other indications or gestures that would indicate a wish to surrender. Instead, he rolled the windows up and moved his seat back to conceal himself in the vehicle. His actions were consistent with feigning compliance with police orders or attempting to trick the police into believing he was prepared to surrender.

{¶ 97} Law enforcement officers then had to determine how they would extract the non-compliant Hubbard from the vehicle. They went above and beyond to use less-than-lethal means, even though they were aware of the threat Hubbard had made to shoot them.

Hubbard claims that no police officer communicated with him. However, the overwhelming evidence was that Hubbard was repeatedly instructed to surrender to police, but he instead chose to ignore those commands.

{¶ 98} Asan's video demonstrates that it was several seconds after the bean bag round had been fired, and after Koda had first leapt up towards Hubbard's vehicle's window, that Hubbard began firing rounds at the officers, ultimately striking Officer Jordan. The photographs introduced at trial made clear that if Hubbard had been firing solely at Koda, he would have been firing towards the front window of the vehicle, and not back towards where officers were positioned in line with the trunk of Hubbard's vehicle.

{¶ 99} Hubbard suggests that he was not at fault because he had PTSD and this caused him to react when police used the bean bag gun and Koda in an attempt to force his compliance. However, as discussed above, the only evidence that Hubbard suffered from PTSD was his own self-serving claim and the claim of his therapist, Petrey. However, Petrey's credibility, and that of her report, was thoroughly called into question at trial. She admitted that she did not verify anything that Hubbard told her in therapy and further admitted that he had omitted telling her significant facts about the case. Two forensic psychologists testified that Hubbard did not have PTSD and furthermore that he had a personality disorder associated with manipulating people into doing what he wanted them to do. Petrey's testimony appears to be an example of this manipulation.

{¶ 100} Having established, beyond any reasonable doubt, that Hubbard was at fault in creating the situation giving rise to the affray, the state disproved Hubbard's self-defense claim and we need not consider the other elements of self-defense. *McFarland*, 2022-Ohio-2326 at ¶ 42; *Byrd*, 2020-Ohio-3073 at ¶ 23.

{¶ 101} We note that this was not a close case on self-defense. A person cannot threaten to shoot police, lead police on an extensive chase, ignore police commands to

surrender, conceal him or herself in a vehicle, and then claim to be justified in shooting at police when they attempt to arrest the person. Here, law enforcement officers went above and beyond to arrest Hubbard without killing him. At no point in time was Hubbard ever justified in shooting at law enforcement officers.

### 3. Alternative Argument – Evidence Supporting Convictions on Counts Four and Six

{¶ 102} Hubbard next contends that if this court finds—as we did above—that the state proved he did not act in self-defense, then his convictions on count four (felonious assault of Deputy Barger) and count six (felonious assault of Trooper Lee), were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 103} Hubbard argues that because neither Deputy Barger nor Trooper Lee were injured in the shooting, then "[t]here is no evidence to show beyond a reasonable doubt that Mr. Hubbard attempted to assault those two officers."

{¶ 104} We disagree. As stated above, for the offense of felonious assault, the state was required to prove that Hubbard knowingly "cause[d] or attempt[ed] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2).

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist.

R.C. 2901.22(B).

{¶ 105} The evidence demonstrated that Hubbard was aware that police had surrounded his vehicle. He was repeatedly looking back at the officers prior to the shooting and was using the driver-side mirror to locate their positions. When he was shooting, his head was above window level so that he could aim and his gun was pointed towards the

officers.

{¶ 106} Hubbard does not dispute that when he began firing, he successfully struck Officer Jordan in the shoulder. Deputy Barger and Trooper Lee were standing immediately to the right of Officer Jordan. The shooting of a gun in a place where there is a risk of injury to one or more persons supports the inference that the defendant acted knowingly. *State v. Gregory*, 90 Ohio App.3d 124, 131 (12th Dist. 1993). Moreover, "an attempt to cause physical harm may be inferred from the act of firing a gun in the direction of a person. *State v. Knowles*, 10th Dist. Franklin No. 16AP-345, 2016-Ohio-8540, ¶ 28. *Accord State v. Grisson*, 10th Dist. Franklin No. 08AP-952, 2009-Ohio-5709, ¶ 43, citing *State v. Phillips*, 75 Ohio App.3d 785, 792 (2d Dist.1991) ("Firing a weapon randomly in the direction of individuals who are arguably within range of the shooter is sufficient to demonstrate an attempt to cause physical harm").

{¶ 107} It is reasonable to assume that Hubbard acted knowingly in attempting to shoot all the officers that were within the area where he was aiming. Furthermore, there was testimony that when Hubbard fired his weapon, he fired his gun in a sweeping or side-to-side motion. He fired five rounds, until his gun jammed. The record contains ample evidence to prove that Hubbard committed the felonious assault against Deputy Barger and Trooper Lee, and the jury did not lose its way in reaching these verdicts. We overrule Hubbard's first and second assignments of error.

## B. Ineffective Assistance of Counsel

{¶ 108} Hubbard's third assignment of error states:

> THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS GUARANTEED BY SECTION 10, ARTICLE 1, OF THE OHIO CONSTITUTION AND THE SIXTH AND FOURTEENTH AMENDMENTS.

{¶ 109} Hubbard contends his defense counsel provided constitutionally defective

performance because counsel failed to use at trial and present into evidence the "use of force" policies of the responding police departments to "show how the response with the shotgun, K-9, and Mr. Hubbard's PTSD related to self-defense." Additionally, Hubbard argues that his counsel was ineffective for having failed to properly voir dire the jury and for the purpose of mounting a challenge to venue.

### 1. Law Applicable to Ineffective Assistance Claims

{¶ 110} To prevail on an ineffective assistance of counsel claim, Hubbard must show his defense counsel's performance was deficient, and that he was prejudiced as a result. *State v. Clarke*, 12th Dist. Butler No. CA2015-11-189, 2016-Ohio-7187, ¶ 49; *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). Defense counsel's performance will not be deemed deficient unless it fell below an objective standard of reasonableness. *Strickland* at 688. To show prejudice, Hubbard must establish that, but for his trial counsel's errors, there is a reasonable probability that the result of his trial would have been different. *Id.* at 694, 104 S.Ct. 2052. The failure to satisfy either prong of the *Strickland* test is fatal to an ineffective assistance of counsel claim. *Clarke* at ¶ 49. We strongly presume that defense counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *State v. Burns*, 12th Dist. Clinton No. CA2013-10-019, 2014-Ohio-4625, ¶ 7. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence * * *." *Strickland* at 689.

### 2. Analysis of Ineffective Assistance Claim

### a. Use of Force Policies

{¶ 111} Hubbard argues that his self-defense claim was premised on police using excessive force to arrest him, which caused him stress, which was exacerbated by his PTSD. Hubbard contends that his defense counsel should have "investigated, obtained, and discussed at trial the 'use of force' policies of the departments that responded." He

contends that these "use of force" policies would "show the overwhelming nature of the response as it related to Mr. Hubbard's subjective response to it * * *."

{¶ 112} Stated otherwise, we believe that Hubbard is arguing that "use of force" policies of the departments that responded on August 31, 2020 would have demonstrated that police used excessive force when attempting to arrest Hubbard and that, in conjunction with his claimed PTSD, this evidence would have demonstrated that Hubbard had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of deadly force.

{¶ 113} This argument is meritless for several reasons. First, there was no evidence presented of any excessive use of force by police officers. Law enforcement officers encountered an individual who had threatened to shoot them, was non-compliant with their efforts to effect an arrest, and who was purposefully concealing himself in a vehicle. The officers deployed a bean bag gun and a K9 to arrest Hubbard. Neither of these methods were lethal and neither of these methods were excessive.

{¶ 114} Second, as stated by Hubbard, no "use of force" policies were submitted at trial. Nor were any "use of force" policies proffered into evidence. As such, this court could only speculate as to the content of such policies. An ineffective assistance of counsel claim cannot be supported by purely speculative evidence or argument. *State v. Miller*, 12th Dist. Brown No. CA2022-09-008, 2023-Ohio-1600, ¶ 26, citing *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, ¶ 119.

{¶ 115} Third, Hubbard cannot show prejudice. We have already determined that the state proved that Hubbard was at fault in the situation giving rise to the incident. Therefore, whether he had a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape is immaterial.

{¶ 116} Accordingly, we find no merit to the argument that Hubbard's defense counsel was ineffective for failing to introduce at trial a police "use of force" policy.

**b. Venue**

{¶ 117} Hubbard next argues that his trial counsel was ineffective for having failed to properly voir dire the jury for the purposes of mounting a challenge to venue. Specifically, he argues that counsel failed to question the venire as to their awareness of pretrial publicity and as to whether they would have the ability to act impartially based on any pretrial publicity materials they had observed. In addition, Hubbard contends that counsel failed to question the venire as to "their biases as to a police officer being shot." Hubbard contends that if counsel had engaged in a proper voir dire with the jury, the case would have been tried in a more "neutral" venue and Hubbard "may have been found not guilty."

{¶ 118} This court has summarized the law applicable to reviewing counsel's performance during jury selection as follows:

> Generally speaking, the right to jury trial guarantees to the criminal defendant a fair trial by a panel of impartial jurors. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942. The questioning of jurors during voir dire must be thorough and meaningful to afford a defendant an impartial jury. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 57. However, the jury selection process is inherently subjective, based upon intangible factors and the experience and intuition of trial counsel. *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 64. No specific questions need to be asked, no particular form is mandated, and questions or topics already covered by the trial judge or opposing counsel need not be repeated. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 61, 66. The decision whether to exercise challenges to prospective jurors falls within the realm of reasonable trial strategy. *State v. Ramirez*, 12th Dist. Clermont No. CA2004-06-046, 2005-Ohio-2662, ¶ 35. We will not second-guess trial strategy decisions such as those made during voir dire because trial counsel, who saw and heard the jurors, is in the best position to determine the extent to which prospective jurors should be questioned and/or challenged. *Adams* at ¶ 61; *Jackson* at ¶ 138; *Ramirez* at ¶ 35.

*State v. Petit*, 12th Dist. Madison No. CA2016-01-005, 2017-Ohio-633, ¶ 41.

{¶ 119} Hubbard states that a review of the voir dire reveals "no meaningful probing by defense counsel as to pretrial publicity * * *." However, as noted by the state, the record of the voir dire demonstrates that defense counsel *did* specifically question jurors about their knowledge of pretrial publicity:

> Defense Counsel: Okay. Now, early in this case, [the judge] asked you if any of you have heard about this case. I will tell you there's a video of this case and there's a video online, the news release.
>
> Did -- has anyone seen a video of a vehicle with a dog jumping towards that vehicle and gunshots?
>
> Prospective Jurors: (Indicated negatively.)
>
> Defense counsel: Does that ring a bell to anyone that --
>
> Prospective Jurors: (Indicated negatively.)
>
> Defense counsel: Okay. I just wanted to make sure because if you did, that could affect it. * * *.

{¶ 120} The record of the voir dire also shows that the court, prosecution, and defense questioned jurors concerning potential bias related to their views of law enforcement. And in fact, a juror who indicated that they would not be able to set aside their personal, favorable views of police officers, was excused during jury selection.

{¶ 121} Accordingly, there is no support in the record for the argument that defense counsel performed deficiently by failing to question jurors either as to pretrial publicity or as to bias concerning law enforcement. Jurors were in fact questioned on those matters by the court, prosecution, and defense counsel and there is no indication in the record that defense counsel acted deficiently by not engaging in more questioning of jurors on these subjects.

{¶ 122} Furthermore, Hubbard has not demonstrated prejudice. His argument that the trial court would have granted a change of venue, if requested, is speculative. And his

argument that a change of venue *may* have resulted in him being found not guilty, is, as suggested by the language employed, also speculative and does not establish ineffective assistance of counsel. *Miller*, 2023-Ohio-1600 at ¶ 26.

{¶ 123} We overrule Hubbard's third assignment of error.

### C. Cruel and Unusual Punishment

{¶ 124} Hubbard's fourth assignment of error states:

THE DEFENDANT-APPELLANT WAS SUBJECT TO CRUEL AND UNUSUAL PUNISHMENT.

{¶ 125} Hubbard contends that his sentence violated the prohibition against cruel and unusual punishment found in the Eighth Amendment to the United States Constitution. Hubbard argues that his aggregate sentence of 56 to 61- and one-half years is "egregiously too long" when compared to other cases. He argues that of the three felonious assault counts, only one person suffered physical injuries. Hubbard asks us to modify his consecutively-imposed sentences to concurrent sentences.

### 1. Applicable Law

{¶ 126} Proportionality review in the context of the Eighth Amendment to the United States Constitution does not apply to aggregate sentences. *State v. Rowland*, 12th Dist. Warren No. CA2019-08-084, 2020-Ohio-2984, ¶ 61. Instead, the focus is on individual sentences, rather than on the cumulative impact of multiple sentences imposed consecutively. *Id*. The Ohio Supreme Court has stated:

Where none of the individual sentences imposed on an offender are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment.

*State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, ¶ 20.

{¶ 127} Furthermore, it is generally accepted that the punishments which are

prohibited by the Eighth Amendment are "limited to torture or other barbarous punishments, degrading punishments unknown at common law, and punishments which are so disproportionate to the offense as to shock the moral sense of the community." *State v. Blanton*, 12th Dist. Butler No. CA2008-09-235, 2009-Ohio-3311, ¶ 28, quoting *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69 (1964).

{¶ 128} Upon review, we find that Hubbard's individual sentences were not "grossly disproportionate" to the corresponding crimes. Initially, we note that all of Hubbard's individual sentences were within the authorized statutory range. This includes all the firearm specifications of which he was convicted and sentenced, and which we note Hubbard does not dispute were required to be imposed consecutively. Moreover, the trial court elected not to impose the maximum sentences for count four (felonious assault of Deputy Barger) and count six (felonious assault of Trooper Lee).

{¶ 129} Beyond that, the facts of this case are egregious. Hubbard repeatedly threatened to shoot police officers prior to the events of August 31, 2020. Each person he spoke to believed him when he said he would do so. Hubbard even went as far as asking Holloway to tell his child about him if he were to perish in a police shoot out. By all accounts, it appears that Hubbard was intent on killing police or being shot to death by police. Instead of surrendering to police when they attempted to arrest him, he led police on a 28-mile chase, ultimately stopping his car positioned in between officers and the home of innocent bystanders. Instead of complying with police commands to exit his vehicle, he concealed himself in the vehicle and waited until officers attempted to arrest him. He fired five rounds in quick succession towards the group of officers closest to him, striking one of them twice. He had 12 cartridges remaining in his gun and it appears likely that he would have emptied that gun if it had not jammed and he had been capable of operating the firearm.

{¶ 130} We reject the notion that Hubbard's sentence should have been more lenient

simply because Deputy Barger and Trooper Lee were not "physically" harmed by Hubbard. Hubbard's actions resulted in Deputy Barger and Trooper Lee being placed in substantial danger of physical harm.

{¶ 131} We do not find that Hubbard's individual sentences shock the conscience or are grossly disproportionate to the offenses. Nor do we find that the sentences—either individually or in the aggregate—constitute cruel and unusual punishment under the Eighth Amendment. *Hairston*, 2008-Ohio-2338 at ¶ 20. Accordingly, we overrule Hubbard's fourth assignment of error.

### D. "Motion to Withdraw Appeal"

{¶ 132} While this appeal was pending, and after the parties' briefs were filed, oral arguments presented, and the submission of the case to the court for decision, Hubbard filed a pro se motion in this court on November 3, 2023, styled "Motion to Withdraw Appeal to Correct Attorney Errors * Motion for New Counsel *." In it, Hubbard argues that his appellate attorney submitted his appeal "without Hubbard's prior approval" and should have raised 11 more "errors" in the appeal. Those purported errors include, but are not limited to, Hubbard's claim that he was "illegally stalked" by police and that police were responsible for what occurred because their attempts to arrest him were illegal. Hubbard also claims that the trial judge was not impartial towards him, that the prosecutor engaged in prosecutorial misconduct, and that his trial counsel was ineffective for various reasons.

{¶ 133} Hubbard's claims are in the nature of a premature claim to reopen his appeal based on ineffective assistance of appellate counsel. However, Hubbard has not moved to reopen his appeal under App.R. 26(B), or utilized the procedures set forth therein. Regardless, we have reviewed Hubbard's additional "errors" and his argument in support and we do not find that he has demonstrated any reasonable probability of success on appeal had those issues been raised by his appellate counsel. Nor has Hubbard

demonstrated, with any citations to the record, the basis for any of his claims of ineffective assistance of appellate counsel.  We therefore deny Hubbard's motion.

### III.  Conclusion

{¶ 134}  Hubbard's convictions for felonious assault and assault of a police dog were supported by sufficient evidence and the greater weight of the evidence.  Hubbard has failed to establish that his trial counsel performed deficiently.  Hubbard's sentence was not cruel and unusual.

{¶ 135}  Judgment affirmed.

HENDRICKSON, P.J., and PIPER, J., concur.