[Cite as *State v. Nelson*, 2024-Ohio-5750.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2024-01-004 |
| | : | O P I N I O N |
| - vs - | | 12/9/2024 |
| | : | |
| ALEXANDER C. NELSON, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2023 CR 0235

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas Horton, Assistant Prosecuting Attorney, for appellee.

Joshua R. Crousey, for appellant.

**M. POWELL, J.**

{¶ 1} Appellant, Alexander Nelson, appeals his conviction in the Clermont County Court of Common Pleas for vehicular assault and failure to stop after an accident.

{¶ 2} On November 5, 2021, a road construction crew was working on a two-mile stretch of State Route 756. Eastbound traffic was restricted to individuals residing within the construction zone, motorists whose destination was within the construction zone, and

construction vehicles. At the time of the incident, only one resident lived within the construction zone. Westbound traffic was permitted within the construction zone. Dylan Shulaw and Jarrod Burch were flaggers that day. Shulaw was stationed at the west end of the construction zone. There, a sign was positioned on a barrier blockade informing motorists that the eastbound road was closed. Burch was stationed at the east end of the construction zone and was responsible for controlling traffic proceeding westbound on S.R. 756. Brian Hart was stationed within the construction zone and coordinated the westbound and eastbound movement of traffic and construction vehicles within the zone.

{¶ 3} On the day of the incident, appellant was working for Orkin, a pest control company, and driving the company-issued vehicle, a Toyota Tacoma. Around 2:00 p.m., appellant was driving eastbound on S.R. 756 on his way to a service call behind the fire station in Felicity, Ohio. Felicity is located a few miles east of the construction zone. When appellant reached the west end of the construction zone and the "Road Closed" sign, he was stopped by and spoke with Shulman. Shulman asked appellant if he could use the detour, and appellant replied he could not because he had a service call on that road. Shulman testified appellant made it sound as if the service call was within the construction zone. Appellant, however, testified he told Shulman he had a service call in Felicity, and asked if he could go through the construction zone. Shulman ultimately allowed appellant to drive into the construction zone, telling him that once the dump trucks went through, he could follow the last one. Shulman subsequently radioed to Burch and Hart that appellant was coming through to reach a home in the construction zone.

{¶ 4} Appellant drove into the construction zone. The regular speed limit on this stretch of S.R. 756 is 55 m.p.h. Shortly after Shulman's radio, Hart observed appellant drive through the construction zone at a high rate of speed and radioed what he was witnessing. The Tacoma's electronic data recorder ("EDR") indicated that appellant's

speed reached 67 m.p.h. within the construction zone before coming to a stop at 2:04:14 p.m. Although Hart would typically have stepped into the roadway to stop a vehicle and intended to do so here, he ultimately did not for safety reasons because appellant was travelling too fast.

{¶ 5} While appellant was driving through the construction zone, Dave Peters was operating an excavator and loading a dump truck in the construction zone. Peters observed the Tacoma travelling fast within the construction zone. Appellant did not stop to service a residence within the construction zone. Burch, who had been alerted to the situation, held a dump truck at the east end of the construction zone to force appellant to stop. Appellant came to a stop behind the dump truck. Burch then placed a construction barrel/cone in front of the Tacoma's passenger side and told appellant he would have to turn around. Appellant told Burch he had permission to drive through the zone. Burch replied that whoever told appellant that was wrong and reiterated appellant needed to turn around. Appellant responded, "the F I will" and began driving. Burch remembered the Tacoma pulling forward, himself grabbing something once he felt the impact, and being flung to the ground.

{¶ 6} Peters, who remained on his excavator, had a direct line of sight between the excavator and the scene of the interaction between appellant and Burch. Peters saw Burch step in front of appellant's vehicle to hold him up. Shortly after, Peters saw Burch put his hands down and jump to the passenger side of the Tacoma as if he was trying to jump out of the way, and the Tacoma strike appellant. Peters testified that once the Tacoma struck Burch, he spun in the air, landed on the ground, and was caught beneath the Tacoma's rear passenger-side tire. Peters described it as Burch getting spit out of the back tire. The Tacoma's EDR indicates that nine seconds after the vehicle had stopped, it began moving at 2:04:23 p.m. at 8 m.p.h., reached 40 m.p.h. at 2:04: 28 p.m.,

and 62 m.p.h. at 2:04: 36 p.m.

{¶ 7} Appellant recounted a different version of what occurred. Appellant testified he drove within the construction zone at 35-40 m.p.h., several car lengths behind the dump truck. Though the Tacoma's EDR indicated otherwise, appellant did not believe he was speeding. Appellant stated that as soon as the dump truck passed Burch, the latter put a cone in front of the Tacoma and directed appellant to turn around as he should not have been allowed to drive through the construction zone. Appellant did not have room to turn around as instructed by Burch. Upon observing Burch walk toward the Tacoma's front passenger side and reach the side of the road, appellant decided to go around the barrel/cone and proceed eastbound. Upon straightening the Tacoma to continue eastbound towards Felicity, and now driving at 15-20 m.p.h., appellant testified that Burch came running toward the Tacoma; tried to jump, buttocks first, on the hood; was not successful and slid toward the windshield; got clipped by the passenger side mirror; rolled off onto the road; and got up. Thereafter, Burch and another construction worker started running after him. Fearing for his safety, appellant drove away. As he drove, he first called his supervisor. Then, approximately five minutes after the Tacoma had struck Burch, appellant called 9.1.1.

{¶ 8} As appellant drove away, Peters ran to his car and pursued appellant but was unable to catch up with him on S.R. 756. However, a few miles away, Peters spotted the Tacoma at a service station in Felicity. Peters parked nearby the Tacoma and confronted appellant. A clerk at the service station called police after observing the confrontation between appellant and Peters.

{¶ 9} Appellant was eventually escorted back to the construction site. Clermont County Deputy Sheriff Jeffrey Rudd responded to the scene. Burch was being treated by EMTs. Deputy Rudd noted the orange cone that had been struck and the lack of tire

marks on the road which indicated that appellant had not braked either before or after Burch had been struck. Deputy Rudd observed that Burch had sustained road rash on his back, buttocks, and right calf, a deep scrape on his right knee, and a large head wound. Burch had trouble walking but was able to stand. A more thorough medical examination subsequently revealed that Burch had sustained a brain bleed and a fractured ankle.

{¶ 10} Based upon the foregoing, appellant was cited for reckless operation and failure to stop after an accident, both misdemeanors. The citations were filed in the Clermont County Municipal Court on November 10, 2021. Upon receiving Burch's medical records indicating serious physical harm, the state dismissed the municipal court case on December 10, 2021.

{¶ 11} On April 28, 2022, appellant was indicted in Case No. 22CR000390 on one count of vehicular assault in violation of R.C. 2903.08(A)(2)(a) and one count of failure to stop after an accident in violation of R.C. 4549.02(A)(1), both fourth-degree felonies. Appellant was arrested on the indictment on May 12, 2022, and released on bond the following day. Over the course of the next 12 months, appellant filed discovery requests, and the case was continued several times. Each time, appellant executed a limited time waiver. The case was eventually set for a May 2-4, 2023 jury trial. However, on March 6, 2023, a superseding indictment was filed in Case No. 23CR000235, charging appellant with one count of vehicular assault in violation of R.C. 2903.08(A)(2)(b) and one count of failure to stop after an accident in violation of R.C. 4549.02(A)(1)(a), both fourth-degree felonies. As a result of the superseding indictment, the original indictment case was dismissed on May 4, 2023.

{¶ 12} Appellant was arraigned on the superseding indictment on April 14, 2023, and executed a time waiver until April 26, 2023, and again until May 2, 2023. That day,

appellant moved to dismiss the superseding indictment case for violation of his speedy trial rights. The trial court denied the motion to dismiss on August 10, 2023. On November 2, 2023, appellant waived his right to a jury trial. The matter proceeded to a bench trial on November 6-7, 2023. Burch, Shulaw, Peters, Hart, and Deputy Rudd testified on behalf of the state. Appellant and his former Orkin supervisor testified on behalf of appellant. Appellant's former supervisor testified that the Tacoma's front hood was 48 inches tall, and that appellant was a prompt and valued employee and a truthful and honest person. Burch denied jumping onto the Tacoma's hood, denied he took off running after the Tacoma, and stated he at best started walking toward the Tacoma. Trial testimony also revealed inconsistencies between the testimony of the construction workers regarding whether appellant was following a dump truck within the construction zone, whether Shulaw radioed Burch that appellant was servicing a residence within the construction zone and later that appellant had passed the residence, the number of radio communications between Burch and Hart, and whether Burch used a stop paddle and held a dump truck to force appellant to stop. On November 8, 2023, the trial court found appellant guilty as charged and sentenced him to two years of community control.

{¶ 13} Appellant now appeals, raising two assignments of error.

{¶ 14} Assignment of Error No. 1:

{¶ 15} THE TRIAL COURT ERRED BY FINDING APPELLANT GUILTY WHEN THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION AND THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 16} Appellant argues that his conviction for vehicular assault and failure to stop after an accident is supported by insufficient evidence and is against the manifest weight of the evidence.

{¶ 17} When reviewing the sufficiency of the evidence underlying a criminal

conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Hibbard*, 2023-Ohio-983, ¶ 9 (12th Dist.). The relevant inquiry is whether after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Redden*, 2024-Ohio-1088, ¶ 8 (12th Dist.).

{¶ 18} To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Hibbard* at ¶ 10. While a manifest weight of the evidence review requires an appellate court to evaluate credibility, the determination of witness credibility is primarily for the trier of fact to decide. *State v. Westberry*, 2024-Ohio-2532, ¶ 20 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.*[1]

{¶ 19} Appellant was convicted of vehicular assault, in violation of R.C. 2903.08(A)(2)(b), which provides in relevant part, "No person, while operating . . . a motor vehicle . . . shall [recklessly] cause serious physical harm to another person." "A person acts recklessly when, with heedless indifference to the consequences, the person

---

1. We note that "[w]hen reviewing a jury verdict, the verdict may be reversed as against the manifest weight of the evidence only when there is unanimous disagreement with the verdict." *State v. Marcum*, 2016-Ohio-263, ¶ 10 (12th Dist.). However, "convictions resulting from a bench trial may be reversed by a majority of the panel." *State v. Westberry*, 2024-Ohio-2532, ¶ 19, fn. 3 (12th Dist.), citing *State v. Williams*, 2019-Ohio-992, ¶ 12 (8th Dist.); *State v. Burke*, 2013-Ohio-2888, ¶ 8 (4th Dist.); and *State v. Hill*, 2011-Ohio-6217, ¶ 49 (7th Dist.).

disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature."  R.C. 2901.22(C).  "A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist."  *Id.*   A risk is defined as a "significant possibility, as contrasted with a remote possibility, that a certain result may occur or that certain circumstances may exist."  R.C. 2901.01(A)(7).  "To determine whether a driver recklessly operated a motor vehicle it is necessary to examine 'both the driving in issue and *all* the circumstances under which it took place.'"  (Emphasis in original.)  *State v. Johnson*, 2020-Ohio-2676, ¶ 13 (12th Dist.), quoting *State v. Hartman*, 41 Ohio App.3d 142, 143, fn. 3 (12th Dist. 1987).  "Foremost among these circumstances is the threat this manner of operation poses to others."  *Id.*

{¶ 20} Appellant argues his conviction for vehicular assault is supported by insufficient evidence and is against the manifest weight of the evidence because the state failed to show he acted recklessly.  In support of his argument, appellant states that Shulman allowed him to drive through the construction zone and that Burch was responsible for his own injuries by jumping onto appellant's moving vehicle.  Appellant asserts that his operation of the Tacoma was not the cause of Burch's injuries.

{¶ 21} In challenging his vehicular assault conviction as supported by insufficient evidence, appellant solely relies on his own account of how the incident occurred and how Burch sustained his injuries and ignores the testimony of the state witnesses—Burch and Peters—that appellant accelerated toward Burch as Burch stood in front of the Tacoma, that he struck Burch, and that he ran over him.  The test for sufficiency requires a determination as to whether the state has met its burden of production at trial.  *State v. Peyton*, 2017-Ohio-243, ¶ 41 (12th Dist.).  "In a sufficiency-of-the-evidence review, an

appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines whether or not that testimony satisfies each element of the crime." *State v. Johnson*, 2007-Ohio-2385, ¶ 8 (10th Dist.). In light of the testimony of Burch and Peters, we find that appellant's vehicular assault conviction is supported by sufficient evidence.

{¶ 22} Upon thoroughly reviewing the record, including appellant's testimony, we likewise find that appellant's vehicular assault conviction is not against the manifest weight of the evidence.

{¶ 23} The trial court was justified in discounting appellant's claim that Burch ran toward his moving vehicle and tried to jump on the hood because jumping on the vehicle would be ineffectual in bringing it to a stop, and jumping upon a moving vehicle involves a risk most people would avoid. The trial court was presented with conflicting versions of events by appellant and Burch and Peters. The trial court was also privy to any inconsistencies presented between or within each witness's testimony, acknowledged the existence of inconsistencies, and found that they were not material. When conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the testimony and evidence presented by the state. *State v. Lunsford*, 2011-Ohio-6529, ¶ 17 (12th Dist.). As the trier of fact, the trial court was best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations to judge the credibility of witnesses and the weight to be given the evidence. *State v. Clemmons*, 2020-Ohio-5394, ¶ 24 (12th Dist.). Even though this court may consider the credibility of the witnesses in conducting our manifest-weight analysis, on this record, we do not perceive any justifiable reason to second-guess the credibility determinations made by the trial court. *Id.* Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a

judgment on manifest weight grounds. *State v. Daley*, 2020-Ohio-4390, ¶ 48 (10th Dist.). The trial court did not lose its way and create a manifest miscarriage of justice in believing the state witnesses' testimony such that appellant's vehicular assault conviction must be reversed and a new trial ordered. *See State v. Flinders*, 2012-Ohio-2882 (9th Dist.).

{¶ 24} Appellant was also convicted of failure to stop after an accident, in violation of R.C. 4549.02(A)(1)(a), which provides that in the case of a motor vehicle accident or collision with persons on a public road, "the operator of the motor vehicle, having knowledge of the accident or collision, immediately shall stop the operator's motor vehicle at the scene of the accident or collision" and "shall remain at the scene of the accident or collision until the operator has given the operator's name and address . . . together with the registered number of that motor vehicle, to any person injured in the accident or collision." The applicability of R.C. 4549.02(A)(1)(a) is therefore dependent upon the driver's knowledge of the accident or collision. *See State v. Jones*, 2020-Ohio-857, ¶ 16 (12th Dist.). A person acts knowingly "regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A person has knowledge of circumstances when the person is aware that such circumstances probably exist." *Id.*

{¶ 25} Appellant argues that his conviction for failure to stop after an accident is supported by insufficient evidence and is against the manifest weight of the evidence because he fled the scene under duress, believing he was about to be assaulted by Burch and other angry construction workers who were chasing him. Appellant asserts that his actions of calling his supervisor, travelling to the nearest service station, and eventually calling 9.1.1. are the actions of someone who was afraid of being attacked and sought help immediately. Appellant does not otherwise challenge the evidence related to the elements of the offense.

{¶ 26} We find that appellant's conviction for failure to stop after an accident is supported by sufficient evidence. Despite his knowledge that his vehicle had struck Burch, appellant failed to stop and instead proceeded to leave the scene of the accident. Based upon the foregoing, there was sufficient evidence presented to sustain appellant's conviction of leaving the scene of an accident. *State v. Neely*, 2005-Ohio-7045, ¶ 85 (11th Dist.).

{¶ 27} Nevertheless, appellant asserts duress applies here. "Under Ohio law, duress is an affirmative defense which must be proved by the defendant. Duress constitutes a claim that the defendant's apparent criminal conduct is negated by reason that he or she engaged in the conduct as a result of the threat of violence from which he or she could not safely withdraw." *State v. Broughton*, 1993 Ohio App. LEXIS 818, *3 (12th Dist. Feb. 16, 1993). An affirmative defense is not an element of a crime. *State v. Messenger*, 2022-Ohio-4562, ¶ 24. As an affirmative defense, duress is not considered in a sufficiency-of-the-evidence analysis. *State v. Hubbard*, 2024-Ohio-1315, ¶ 89 (12th Dist.). "This is because an affirmative defense does not negate the legal adequacy of the state's proof of an offense for purposes of submitting it to a jury." *Id.* "Instead, it provides the legal justification for having committed the offense." *Id.* Accordingly, as it relates to appellant's duress argument, we review his conviction only on the manifest weight of the evidence.

{¶ 28} One of the essential features of the defense of duress is a sense of immediate, imminent death, or serious bodily injury if the actor does not commit the act. *State v. Getsy*, 84 Ohio St. 3d 180, 199, 1998-Ohio-533. The force used to compel the actor's conduct must remain constant, controlling the will of the unwilling actor during the entire time he commits the act, and must be of such a nature that the actor cannot safely withdraw. *Id.* "[D]uress can be effectively shown only by the defendant testifying as to

- 11 -

the fear or force which compelled him to act." *State v. Howard*, 2013-Ohio-1489, ¶ 31 (12th Dist.). "The trier of fact is not bound by the arguments of the defendant and may reject the defense on grounds of credibility." *State v. Bishop*, 1998 Ohio App. LEXIS 4733, *19 (12th Dist. Oct. 5, 1998). Furthermore, "'in order to assert a defense of duress, one must logically admit involvement in the crimes charged.'" *Howard* at ¶ 31, quoting *State v. Skatzes*, 2004-Ohio-6391, ¶ 193. To establish duress, one must also establish he was without fault in bringing about the situation. *See Flinders*, 2012-Ohio-2882 at ¶ 30; *State v. Lawson*, 2008-Ohio-1311, ¶ 20-21 (2d Dist.).[2]

**{¶ 29}** Appellant testified he decided not to comply with Burch's directive to turn around and chose instead to go around the barrel/cone and proceed eastbound on S.R. 756. Despite knowing the Tacoma had struck Burch, appellant continued driving eastbound. As he was driving away, he observed that Burch started running towards the Tacoma and that another construction worker—Peters—got into his car and chased after the Tacoma. Appellant testified he felt threatened and drove away due to the hostility of the environment. Appellant admitted he could have stayed at the scene of the accident, locked the doors of the Tacoma, rolled the window up, and called 9.1.1. Instead, he called 9.1.1. five minutes after the collision between the Tacoma and Burch, away from the scene.

**{¶ 30}** In finding appellant guilty of failure to stop after an accident, the trial court rejected appellant's defense of duress on grounds of credibility. Specifically, the trial court found that appellant chose to ignore Burch's directive to turn around, chose to drive

---

2. "The terms 'necessity' and 'duress' are distinct, yet are often used interchangeably and are often indistinguishable." *State v. Cross*, 58 Ohio St.2d 482, 482, fn. 2 (1979). "They share in common the fact that they provide an excuse, justification or affirmative defense to a criminal charge. Running throughout their meanings is the theme that imminent, immediate danger or threat of danger prevents the actor from exercising his own will, and that there is no alternate path to take. Therefore, the actor is forced to choose between the lesser of two evils." *Id.*

forward to exit the construction zone, thereby running over Burch, subsequently continued to proceed on S.R. 756, and failed to stop for several miles, despite opportunities to do so. The court stated, "I don't believe you were afraid. If you were afraid, it's because you ran somebody over." The testimony of the state witnesses plainly shows that appellant created the situation resulting in the accident. Moreover, the pursuit of appellant was a direct response to his striking Burch and fleeing the scene. Had appellant not fled the scene, Peters would not have pursued him. As the trier of fact, the trial court was best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations to judge the credibility of witnesses and the weight to be given the evidence. *Clemmons*, 2020-Ohio-5394 at ¶ 24. The trial court was entitled to believe the state's version of the events and disbelieve appellant's assertion of duress. Even though this court may consider the credibility of the witnesses in conducting our manifest-weight analysis, on this record, we do not perceive any justifiable reason to second-guess the credibility determinations made by the trial court. *Id.* Appellant's conviction for failure to stop after an accident is not against the manifest weight of the evidence.

{¶ 31} Appellant's first assignment of error is overruled.

{¶ 32} Assignment of Error No. 2:

{¶ 33} THE TRIAL COURT ERRED BY NOT DISMISSING THE CHARGES AGAINST APPELLANT DUE TO A VIOLATION OF HIS SPEEDY TRIAL RIGHTS.

{¶ 34} Appellant argues that the trial court erred in failing to dismiss the superseding indictment because his rights to a speedy trial were violated.

{¶ 35} The right to a speedy trial is guaranteed to all state criminal defendants by the Sixth and Fourteenth Amendments to the United States Constitution and by Section 10, Article I of the Ohio Constitution. *State v. Miller*, 2009-Ohio-4831, ¶ 8 (12th Dist.). Additionally, Ohio recognizes a statutory right to a speedy trial and has enacted R.C.

2945.71 to 2945.73 to provide specific time requirements for the state to bring a defendant to trial. The speedy-trial statutory provisions are mandatory and must be strictly construed against the state. *Id.* On appeal, appellant raises only a violation of his statutory speedy-trial rights.

{¶ 36} An appellate court's review of a speedy-trial issue involves a mixed question of law and fact. *State v. Redelman*, 2013-Ohio-657, ¶ 19 (12th Dist.). The appellate court must defer to the trial court's findings of fact if they are supported by competent, credible evidence, but will independently review whether the trial court properly applied the law to the facts of the case. *Id.*

{¶ 37} The relevant dates for speedy-trial purposes in this case are as follows.

### Clermont County Municipal Court Case

- November 5, 2021-Appellant is served with misdemeanor citations for reckless operation and failure to stop after an accident;

- November 10, 2021-The misdemeanor citations are filed in the Clermont County Municipal Court;

- November 19, 2021-The state is in receipt of Burch's medical records indicating Burch sustained serious physical harm;

- November 23, 2021-Appellant files a discovery request;

- December 2, 2021-The state responds to appellant's discovery request;

- December 10, 2021-The state dismisses the misdemeanor charges pending against appellant in the municipal court.

### The Original Indictment Case

- April 28, 2022-Appellant is indicted on one count of vehicular assault in violation of R.C. 2903.08(A)(2)(a), and one count of failure to stop after an accident in violation of 4549.02(A)(1), both fourth-degree felonies;

- May 12, 2022-Appellant is arrested;

- May 13, 2022-Appellant is released from jail on bond;

- May 20, 2022-Appellant files a discovery request;

- May 24, 2022-By agreement of the parties, the case is continued to June 28, 2022. Appellant waives time;

- June 6, 2022-The state responds to appellant's request for discovery;

- June 28, 2022-At appellant's request, the case is continued to August 1, 2022. Appellant waives time;

- July 21, 2022-August 1, 2022-At appellant's request, the case is continued to August 5, 2022. Appellant waives time until August 5, 2022;

- August 5, 2022-By agreement of the parties, the case is continued to August 30, 2022. Appellant waives time;

- August 30, 2022-By agreement of the parties, the case is continued to September 21, 2022. Appellant waives time;

- September 21, 2022-By agreement of the parties, the case is continued to October 13, 2022. Appellant waives time;

- October 13, 2022-By agreement of the parties, the case is continued to October 27, 2022. Appellant waives time;

- October 27, 2022-By agreement of the parties, the case is continued to November 4, 2022. Appellant waives time;

- November 3, 2022-Appellant files a notice of substitution of counsel;

- November 4, 2022-By agreement of the parties, the case is continued to November 17, 2022. Appellant waives time;

- November 16, 2022-Appellant's new counsel moves for discovery, a bill of particulars, and notice of intent to use evidence;

- November 17, 2022-By agreement of the parties, the case is continued to December 6, 2022. Appellant waives time;

- December 6, 2022-By agreement of the parties, the case is continued to December 14, 2022. Appellant waives time;

- December 14, 2022-By agreement of the parties, the case is continued to March 20-23, 2023, for jury trial. Appellant waives time;

- February 16, 2023-The case is set for a plea or trial setting on February 24, 2023;

- February 24, 2023-At the state's request, the jury trial is continued to May 2-4, 2023. Appellant waives time; and

- May 4, 2023-Case is dismissed on motion of the state due to the superseding indictment filed on April 6, 2023.

**The Superseding Indictment Case**

- April 6, 2023-Appellant is indicted on one count of vehicular assault in violation of R.C. 2903.08(A)(2)(a) and one count of failure to stop after an accident in violation of 4549.02(A)(1)(a), both fourth-degree felonies;

- April 14, 2023-Appellant moves for and is granted a continuance. The case is continued to April 26, 2023, for a pretrial hearing. Appellant waives time;

- April 26, 2023-By agreement of the parties, the case is continued to May 2-4, 2023, for a jury trial. Appellant waives time;

- May 2, 2023-Appellant files a motion to dismiss for violation of his speedy trial rights. By agreement of the parties, the case is continued to June 12, 2023, for a hearing on the motion to dismiss. Appellant waives time;

- June 12, 2023-Trial court's agreed entry; the parties will submit pleadings on the motion to dismiss;

- August 9, 2023-By agreement of the parties, the case is continued to November 6-8, 2023, for a jury trial;

- August 10, 2023-Judgment entry denying appellant's motion to dismiss journalized;

- November 2, 2023-Appellant waives his right to a jury trial;

- November 6-7, 2023-Bench trial; and

- November 8, 2023-Judgment entry journalized finding appellant guilty as charged.

{¶ 38} One area of disagreement between appellant and the state concerns the municipal court case. Appellant asserts that his right to a speedy trial began on November 5, 2021, the day he was served with misdemeanor citations for reckless operation and failure to stop after an accident, and that the speedy trial time that elapsed during the municipal court case should count because the state was aware Burch had been seriously injured, as evidenced by the police crash report, when it filed the misdemeanor citations in the municipal court. In support of his argument, appellant cites *State v. Adams*, 43 Ohio St.3d 67 (1989). In turn, the state argues that the speedy trial time elapsed in the municipal court case does not count because it did not know the extent of Burch's injuries—the brain bleed and fractured ankle—until it received Burch's medical records

sometime after the municipal court case was filed. In support of its argument, the state cites *State v. Baker*, 78 Ohio St.3d 108, 1997-Ohio-229.

{¶ 39} In 1980, the Ohio Supreme Court held that "where a prosecutor obtains a felony indictment, based upon the same conduct as was a previously *nolled*, lesser-included misdemeanor charge, the time within which the accused shall be brought to trial pursuant to R. C. 2945.71 *et seq.* consists of whatever residue remains from the 270-day period set forth in R.C. 2945.71(C) after deducting the speedy trial time expended prior to the *nolle prosequi*." *State v. Bonarrigo*, 62 Ohio St.2d 7, 11 (1980). In *Adams*, the supreme court then held that "[w]hen new and additional charges arise from the same facts as did the original charge and the state knew of such facts at the time of the initial indictment, the time within which trial is to begin on the additional charge is subject to the same statutory limitations period that is applied to the original charge." *Adams* at 68.

{¶ 40} In *Baker*, the supreme court addressed whether the speedy-trial statute requires additional criminal charges filed in a subsequent indictment to run from the date of the defendant's original arrest, or whether the statute allows the state a new time period from the date of the subsequent indictment. *Baker* at 110. The supreme court held, "In issuing a subsequent indictment, the state is not subject to the speedy-trial timetable of the initial indictment, when additional criminal charges arise from facts different from the original charges, or the state did not know of these facts at the time of the initial indictment." *Id.*

{¶ 41} In *Redelman*, we rejected an argument similar to the one advanced by appellant, i.e. that based upon the deputy's observations at the scene and his crash report, the state knew Burch had suffered serious injuries when the municipal court case was filed:

As an aside, we are well aware of appellant's position that the

lab results were not new facts for the purposes of *Baker* because the officers could have used the internet to identify the other substances in the hotel room. While some drugs may, in fact, be more easily recognized in the field, given the diversity and sheer number of items recovered by the officers in this case, we cannot say that the operative facts supporting the drug charges in the second indictment were present at the time of appellant's arrest.

We are also aware of appellant's contention that the lab results cannot constitute new facts because the officers already suspected that the substances recovered were drugs on the day of the arrest, as indicated by Major Prickett's affidavit in support of the search warrant, which stated that on May 19, 2011, the undercover officer had purchased "green vegetation, which appeared to be marijuana [and] . . . blotter paper, which appeared to contain LSD." However, Ohio courts have held that although an arresting officer may have *suspected* a certain type of contraband at the time of the arrest, a subsequent laboratory report confirming those suspicions was nevertheless an additional fact not known to the state at the time the original charges were filed. (Emphasis added.)

(Citations omitted.) *Redelman*, 2013-Ohio-657 at ¶ 31-32.

{¶ 42} This case is much like the situations in *Baker* and *Redelman*. Although the state may have suspected that Burch was seriously injured, any such suspicion was not confirmed until the state received Burch's medical records. Because the medical records were not available to the state at the time it filed the municipal court case, the rule announced in *Baker* applies, and the state was not subject to the speedy-trial timetable applicable to the municipal court case. Appellant is therefore not entitled to any time credit from the municipal court case against the statutory speedy-trial time, and the speedy-trial clock begins to run with the original indictment charging appellant with two felonies. *Baker*, 78 Ohio St.3d at 111-112.

{¶ 43} A defendant charged with a felony must be brought to trial within 270 days after the day of his arrest. R.C. 2945.71(C)(2). The day of the arrest is not included in the count. *State v. Messer*, 2007-Ohio-5899, ¶ 12 (12th Dist.). Further, "each day during

- 18 -

which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." R.C. 2945.71(E). As with other fundamental rights, a criminal defendant may waive speedy-trial rights. *State v. Ramey*, 2012-Ohio-2904, ¶ 18. To be effective, an accused's waiver of his statutory speedy-trial rights must be expressed in writing or made in open court on the record. *Id.* Additionally, the time within which an accused must be brought to trial may be extended by any of the tolling events listed in R.C. 2945.72. These include (1) "the period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion," and (2) resolution of motions made by the defendant. Demands for discovery are also tolling events. *State v. Brown*, 2002-Ohio-7040, ¶ 26.

**{¶ 44}** Appellant was arrested on the original indictment on May 12, 2022. This day of arrest is not included in computing speedy trial time. He was released on bond the following day, May 13, 2022. Because appellant spent one day in jail before posting bond, the May 13, 2022 day counts as three days under R.C. 2945.71(E). His trial commenced on November 6, 2023. Thus, the time lapse between appellant's release on bond on the original indictment and his bench trial on the superseding indictment was 542 days. However, as the timeline above shows, appellant filed discovery requests and executed several limited time waivers, and the case was continued several times in the original indictment case. Likewise, the superseding indictment case was continued more than once. Appellant does not challenge the grant of the numerous continuances as being unreasonable or granted other than upon his own motion.

**{¶ 45}** The principal area of disagreement between appellant and the state concerns whether the numerous delays in the original indictment case should count against the state. Noting that these delays were due to his limited time waivers, appellant argues that these time waivers do not apply to the superseding indictment case for

speedy-trial calculation purposes. In support of his argument, appellant cites the Ohio Supreme Court's decisions in *Adams* and *Blackburn*, 2008-Ohio-1823.

{¶ 46} In *Adams*, the supreme court held that for a time waiver to be valid, it must be done knowingly, voluntarily, and intelligently, which includes an understanding of the nature of the charges, what is being waived, and the extent of the waiver. *Adams*, 43 Ohio St.3d at 69. In finding that a time waiver does not apply in a subsequent case involving new or additional charges, the supreme court explained,

> Indeed, a defendant, for tactical reasons may choose to waive the right to a speedy trial as to an initial charge, but if a *nolle prosequi* is entered as to that charge, other defense considerations may arise which will affect his decision whether to waive the right to a speedy trial as to any subsequent charges stemming from the same set of circumstances. Thus, a knowing and intelligent waiver cannot be made until all the facts are known by the accused, which includes knowing the exact nature of the crime he is charged with.

*Id.* at 70. Consequently, the court held, "when an accused waives the right to a speedy trial as to an initial charge, this waiver is not applicable to additional charges arising from the same set of circumstances that are brought subsequent to the execution of the waiver." *Id.*

{¶ 47} *Adams* addressed the effect of a defendant's time waiver upon a subsequently filed charge arising out of the same facts as the original charge. In turn, *Blackburn* addressed the effect of motions filed by a defendant in a previous case upon a subsequent case arising out of the same underlying facts and circumstances of the previous case. The supreme court recognized that a speedy-trial waiver and the tolling provisions of R.C. 2945.72 "are two separate, distinct concepts that affect the speedy-trial calculations in different ways." *Blackburn*, 2008-Ohio-1823 at ¶ 16. The court explained that "[a] waiver relinquishes the right [to speedy trial], at least until the waiver

is withdrawn" whereas "[t]olling occurs by operation of the statute" and "does not necessarily require an informed, tactical decision." *Id.* at ¶ 18-19. Therefore, the court held, "In calculating the time within which a criminal defendant must be brought to trial under R.C. 2945.71, periods of delay resulting from motions filed by the defendant in a previous case also apply in a subsequent case in which there are different charges based on the same underlying facts and circumstances of the previous case." *Id.* at syllabus. The court further recognized that a continuance granted upon an accused's motion is a tolling event pursuant to R.C. 2945.72(H). *Id.* at ¶ 17; *State v. Martin*, 2019-Ohio-2010, ¶ 16. Likewise, any continuances granted by a joint motion or agreement of the parties toll the statutory speedy-trial time limits. *State v. Graham*, 2019-Ohio-2020, ¶ 42 (10th Dist.); *State v. Christian*, 2014-Ohio-2590, ¶ 13 (7th Dist.).

{¶ 48} It follows that while the numerous time waivers executed by appellant in the original indictment case do not apply in the superseding indictment case, the periods of delay resulting from continuances granted at the request of appellant or by agreement of the parties in the original indictment case apply in the superseding indictment case and toll the time within which appellant was required to be brought to trial.

{¶ 49} Regarding the original indictment case, the record shows that the 208-day delay from May 20, 2022, to December 14, 2022, resulted from appellant's initial discovery request and the case being continued 11 times at appellant's request or by agreement of the parties, and that the 96-day delay from November 14, 2022, to March 20, 2023, resulted from a continuance granted by agreement of the parties. Thus, the 304 days are chargeable to appellant. R.C. 2945.72(E) and (H); *Graham*; *Christian*. Regarding the superseding indictment case, the record shows that the 59-day delay from April 14, 2023, to June 12, 2023, and the 89-day delay from August 9, 2023, to November 6, 2023, resulted from the case being continued four times at appellant's request or by

agreement of the parties. Thus, the 148 days are chargeable to appellant. Or, stated otherwise, chargeable to the state are the 9 days from May 13, 2022, to May 20, 2022 (including the one day spent in jail counting as three days under R.C. 2945.71[E]), the 15 days from March 20, 2023, to April 6, 2023, the 8 days from April 6, 2023, to April 14, 2023, and the 58 days from June 12, 2023, to August 8, 2023, for a total of 90 days. Even if we were to add the 25 days appellant asserts are chargeable to the state in the municipal court case, the total speedy trial time attributable to the state would be 115 days. This is well within the statutory time frame. Appellant's speedy-trial rights were therefore not violated and the trial court did not err in denying appellant's motion to dismiss the superseding indictment.

{¶ 50} Appellant's second assignment of error is overruled.

{¶ 51} Judgment affirmed.


BYRNE, P.J., concurs.

PIPER, J., dissents in part and concurs in part.


**PIPER, J. dissenting in part and concurring in part.**

*Dissent on Nelson's First Assignment of Error*

{¶ 52} There are two diametrically opposed versions of how the Tacoma pick-up truck, which Nelson was operating, and Burch's body, came into contact. How the contact occurred depends on credibility and believability of the testimony and evidence presented.[3]

---

3. The meaning of "credibility" and "believability" possess a slight, but important, difference. This is significant when considering "[w]eight of the evidence involves the state's burden of persuasion." *State v. Hill*, 2024-Ohio-2744, ¶ 23 (12th Dist.); *see State v. Huffman*, 2024-Ohio-889, ¶ 42 (12th Dist.) (a challenge to the weight of the evidence relates to the persuasiveness of the evidence). Sincere testimony or evidence itself can be considered credible, but when the weight of more probable circumstances exists and are

**{¶ 53}** The trial court determined that the state proved beyond a reasonable doubt that Nelson recklessly ran the Tacoma into Burch with a substantial and heedless indifference to the consequence to the point where it would likely or probably cause serious physical harm to Burch. The trial court also determined that the impact was the result of Nelson's anger. The trial court further acknowledged that it was likely the incident disturbed Nelson, but nevertheless, determined Nelson was not under duress in continuing away from the scene and calling the police despite Burch's impulsive attempt to hang or grab onto the Tacoma pick-up truck as Nelson drove away.

**{¶ 54}** After thoroughly reviewing the record, I respectfully disagree with the trial court's conclusions and my colleagues' review of the record. A reasonable resolution of the conflicting evidence requires Nelson's convictions be reversed and the matter remanded for a new trial. This is because, as explained more fully below, the trial court's findings of guilty are contrary to the manifest weight of the evidence. *See State v. Thompkins,* 78 Ohio St.3d 380, 387 (1992) citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982) (appellate review reverses on manifest weight of the evidence grounds only when after reviewing the entire record the fact-finder's resolution of the conflicting testimony lost its way).[4]

**{¶ 55}** After Burch initially stopped Nelson and a brief exchange occurred, Nelson

---

considered as a whole, that same testimony or evidence can amount to insufficient believability and therefore fail to meet the state's burden of persuasion. *See McBride v. McBride,* 2012-Ohio-2146, ¶ 37 (12th Dist.) (Piper, J., dissenting). Weighing the greater amount of credible evidence is not a question of mathematics. It instead depends on whether the evidence induces belief. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, citing State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52.

4. The trial court acknowledged it was likely Burch had a temper, and that Nelson had permission to enter the pass-through lane. At sentencing the trial court "wished Mr. Burch would have just let you [Nelson] go and call the police. But you know it was personal to him." Furthermore, Burch's testimony, even in isolation, demonstrates he saw the vehicle's movement to exit the construction zone and tried to hang onto or grab it, which resulted in his injuries.

then attempted to complete his exit by navigating the Tacoma around an orange object. [5] Burch was adamant Nelson was not going to be permitted to exit. Burch attempted to hop onto the hood in an effort to stop the truck a second time. With difficulty in finding something to hang onto or grab, Burch rolled off (or let go) of the vehicle moving to the right and was hurt when his head hit the ground, and Nelson ran over his ankle. Nelson, "rattled" and outnumbered by the construction workers, heard yelling and saw Burch get up and start chasing him. Seeing the confrontation escalating, Nelson was prudent in driving until he reached a public place to call his employer and the police.[6]

{¶ 56} In ruling on the admissibility of testimony, the trial court acknowledged the difficulty credibility determinations present. The court also had to stop testimony *numerous* times indicating it was confusing and difficult to follow. This may have been what obscured the material importance of multiple inconsistencies. Even the court made mention of the multiple inconsistencies among several witnesses. This is why, upon my review of the record, I am convinced that the evidence, or lack thereof, did not meet the state's burden of persuasiveness and in fact sufficiently supported Nelson's testimony. Rather, given a simple review of the record, it seems clear that Burch's injuries occurred due to his conduct and not because Nelson was reckless to a substantial and probable risk of causing Burch serious physical harm in trying to complete the Tacoma's maneuver around the orange object to exit the construction zone.

---

5. The orange object Burch placed in front of the Tacoma by Burch was referenced as both a "cone" and a "barrel." This is but one example of how the testimony was confusing. The state introduced a photo of a damaged orange barrel, but no testimony suggested Nelson damaged a "barrel." Whether the barrel was damaged previously, damaged by Nelson, or by Burch's coworker who gave vehicular chase to "catch" Nelson, remains unknown.

6. The trial court refuted Nelson's claim of duress suggesting he could have pulled into a driveway somewhere or stopped along the road to call and report the incident. However, it must be noted a witness in the public place called police upon observing the coworker's confrontational advance upon Nelson. The coworker demanded Nelson get off the phone because he was taking Nelson back to the scene. Fortunately, a deputy timely responded on scene to the witness' call and separated the coworker from Nelson. Nelson's concern for safety was legitimate and indicative of his duress.

*Brief Summary—Nelson's Version*

**{¶ 57}** Nelson described Burch hopping onto the hood of the truck apparently in an effort to stop the Tacoma a second time. Yet, because the Tacoma was already moving around the object, Burch rolled off the right side of the hood with nothing to hold onto, apparently striking or grabbing the mirror in the process. After hitting the ground, Burch radioed others that he had been hit and got up to chase on foot; a coworker also gave chase in a vehicle. Reasonably believing Burch and his coworkers were angry and chasing him, Nelson drove to the nearest populated establishment to call his employer and law enforcement to report the incident. Nelson's testimony was reasonable, was supported by aspects of Burch's testimony, and was always consistent.[7]

*Brief Summary —Burch's Version*

**{¶ 58}** Burch's testimony contained numerous instances of the inability to recall events. Different answers to the same subject matter made his testimony confusing. Burch seems to claim he was to the front-right of the Tacoma when he felt impact. But he also says he could have been to the side of the vehicle when he tried to grab onto something. Burch's "guess" was that he saw the "car lunge forward *a little bit.*" (Emphasis added.) He remembered "grabbing something" and feeling impact and he tried to hold on but got flung down. Yet, when asked if the truck hit him because of accelerating, Burch said, "I can't--- I – I can't say for sure."

**{¶ 59}** When the vehicle went forward Burch could not say where he was. He did not know if he was in front of the vehicle or to the side of the vehicle. Obviously, if he was to the side of the vehicle the only thing to grab onto would be the mirror which was

---

7. At the conclusion of the trial, the court gave its version of what happened. Nelson was warned his sentence could be different if he persisted in his version of the events. Despite the warning, Nelson's subsequent description of the incident never changed during his PSI interview knowing it was conducted for the purposes of sentencing.

otherwise unexplainably torn loose. Similarly, if Burch had tried to hop onto the hood of the elevated Tacoma (which he said he could do if he wanted to) he would naturally try to grab onto something, only to roll off hitting the ground. Regardless, Burch eventually acknowledged "I can't say what happened."

{¶ 60} Burch only remembers a few things. He remembers the Tacoma moving *a little bit* and him trying to grab something. He remembers "impact," but cannot definitely state whether it was from him trying to hop on the hood or from hitting the ground. Burch also does not remember the Tacoma accelerating. In admitting he does not remember or cannot recall many things, I find it ironic that Burch can remember the one thing Nelson says with certainty; Burch remembers that he never tried to hop onto the hood in a failed attempt to stop the truck. I also find it ironic that Burch does not just contradict his own testimony, the state presented testimony from other witnesses that also contradicted Burch's testimony. One of the coworkers had Burch "kind of jump to the left," which would be a movement toward the center-front of the Tacoma, not away from the direction of the vehicle's movement. Moving to the center-front of the vehicle would be a movement necessary to stop the vehicle by hopping onto the hood (as Nelson described).

{¶ 61} A coworker described Burch "flying" over the hood of the truck, with Burch's midsection going underneath a tire and his body tumbling out from underneath the truck as if he had been "spit-out." Such a description finds no support in the physical evidence. There was no evidence of injuries which would be indicative of a person tumbling underneath the truck or a crushing, grinding injury to the midsection. Burch had no bruising or injury to his midsection—front, side or back. The Tacoma was weighed with the product and the equipment it was hauling; significant damage would have occurred if the description was close to being accurate. The only way Burch could be "flying" over the elevated Tacoma is if someone was exaggerating; "a little bit" of movement would not

produce "flying" unless what was seen was Burch's attempted leap to the hood.

{¶ 62} The confusing presentation of testimony, absence of evidence, and inconsistencies, when combined, nullify Burch's credibility as well as the persuasiveness of the state's case.

*Other Examples*

{¶ 63} Burch initially placed an orange object in front of the Tacoma to prevent it from completing its exit. Nelson attempted to explain he had been authorized to enter the pass-through lane by the front flagman. Burch indicated he did not care if Nelson had permission.[8] Burch used the F-word in commanding Nelson to turn around and travel the pass-through lane a considerable distance back to the entrance to take the lengthier detour around. Even the trial court acknowledged the possibility that Burch was a bit of a bully. Nelson attempted to reason he was already at the exit point, but Burch had already determined to exercise authority. In the face of Burch's hostility, Nelson admitted using the F-word in return.

{¶ 64} Burch denied under oath he used the F-word. The trial court found Burch's testimony not credible. Burch's denial under oath that he used profanity makes it reasonable to assume Burch was trying to hide from the court the degree of heightened hostility he displayed toward Nelson. Or maybe Burch lied about using profanity because its use was indicative of his irrational commitment to exercise his authority. Either way, lying to a tribunal has an underlying reason that simply cannot be said to be insignificant.

---

8. Burch wanted to levy a consequence to Nelson because he believed Nelson misrepresented that he had a work-related stop along the pass-through lane. However, the state acknowledged Nelson's statement to gain permission was not offered as substantive evidence. What Nelson reported to have said was phrased differently a number of times. Regardless, the trial court found Nelson had permission to travel the pass-through lane. With permission to enter and travel the pass-through lane, Burch had no reason to prevent Nelson's exit—whether he approved of the front flagman's grant of permission or not. The front flagman who gave the permission never told Nelson he was to return to the beginning of the pass-through lane after making a service call.

{¶ 65} Even if we leniently assume Burch's untruthfulness was an answer to a question of slight significance, it then becomes cogent to scrutinize his truthfulness regarding his answers to questions of more importance. If Burch would lie because he was embarrassed about using profanity, what else would he lie about if he was embarrassed? Contrary to Burch, Nelson acknowledged they both used the F-word, and the trial court believed Nelson—not Burch.

{¶ 66} Nelson's truthfulness was consistent with the testimony of a former supervisor who testified that Nelson was known for being a "very honest and truthful person." The significance of Burch's untruthfulness and the inconsistencies of testimony from state witnesses became lost when the trial court attempted to reconcile the evidence. The absence of evidence and lack of clear testimony obscured the persuasiveness necessary for the state to meet its burden.

{¶ 67} The Tacoma was an elevated pick-up truck, although the degree of elevation was not provided. Commonsensically, it would take a degree of distance and torch-speed from a stopped position to throw Burch's weight upward and onto the hood. Such a speed was never indicated by evidence, even inferentially. Furthermore, it cannot go unnoticed that Burch had no bone fractures or bruising to the pelvis, back, or hip areas where he would have been allegedly struck. He had no whiplash, torn muscle, cuts, or gashes from being suddenly and violently hurled into the air. Similarly, the truck had no headlight damage, front-right dents, or similar evidence of the vehicle impacting Burch's body.

{¶ 68} The front flagman testified that he let Nelson into the pass-through lane to follow a dump truck ahead of him from a distance. But Burch testified there was no moving dump truck for the Tacoma to have followed toward the exit. The state's witness corroborated Nelson's testimony and becomes another example of Burch testifying about

things for which he did not have personal knowledge and did not really know. A further example of confusion in the state's case happened when Nelson was presented with a photograph the state represented as blood in the roadway (supposedly Burch's blood). Nelson identified the substance as brake fluid or leakage from construction equipment, not blood. Subsequently, the state declined to produce the photograph as an exhibit, apparently in concession there was no evidence of blood at the scene.

{¶ 69} The state also presented extensive testimony regarding the speed of Nelson's vehicle upon traversing the lengthy construction zone. Yet, the purported evidence had no relevancy to what happened *after* Burch successfully stopped the Tacoma and engaged Nelson. Not only did Nelson challenge the credibility of the reported speeds, Nelson's former supervisor also questioned the accuracy of those speeds. He explained the Tacoma had a governor which prevented the capability of the truck from producing speeds to the extent reported in the records.[9] The former supervisor acknowledged on cross that he was not aware of other reasons to challenge the reliability of the records. The state took this to mean it had established the evidentiary foundation for admissibility of the records. However, there was never any foundation, let alone authenticity, established by the state as to the records' admissibility and reliability.[10]

*Conjecture*

{¶ 70} In determining Nelson was guilty, the trial court found that Nelson irrationally ran into Burch. However, neither Burch's testimony nor Nelson's testimony supports such

---

9. A "governor" is a safety device hardwired into a vehicle's computer system which creates the inability of an engine to produce the power necessary for the vehicle to accelerate beyond a programed speed.

10. Anyone aware of the dangers involved with excessive speeds would know driving 103 miles per hour in a single rural lane going through a construction zone, is highly problematic and improbable without an incident. Surely if such excessive speed occurred the police would be called. Testimony established construction workers had the Tacoma's plate number. Regardless, such has no relevancy to what happened *after* Burch successfully stopped the Tacoma Nelson was driving.

a determination. Nelson may have been trying to maneuver around a cone or barrel to exit the construction zone, but there were no road markings or blunt trauma evident of acceleration. With the deepest respect for the trial court, its inferences do not flow from proven facts. To the contrary, there is a much more reasonable inference that it was Burch who was irrational due to the interruption of his personal project.[11] Burch's emotional state was compounded by his perception someone was challenging his authority to order them to turn around and go all the way back to the beginning of the construction zone and take the detour around. Nelson was unwilling to accept Burch's punishment, yet the trial court's conjecture that Nelson irrationally accelerated to the point of being reckless to a substantial and heedless indifference of the probable risk of causing Burch serious physical harm, is insufficiently supported when reconciling all the inconsistences, competing inferences, and lack of clear evidence.

{¶ 71} The trial court rested heavily on its finding that Nelson had sufficient space to turn around, contrary to Nelson's testimony that he did not. Other than Nelson's testimony, the sufficiency of room to turn around was never addressed at trial. The state never offered any evidence to contradict Nelson's testimony that there was no room in the single lane to turn around. The trial court premised its conclusion from a photograph that it reviewed. Yet, from my review, *none* of the photographs in the record show sufficient space for a vehicle to safely turn around. Furthermore, Burch never offered to halt the flow of construction or other exiting vehicles or to help Nelson navigate a tight turnaround. The record is void of any testimony as to whether Burch's command to Nelson was possible or reasonably safe to execute.

---

11. At first Burch tried to deny he told hospital personnel that he had been in the process of repairing his personal vehicle headlight. Upon being confronted with the hospital records he continued to deny it because it wasn't written in his handwriting. Upon being pressed, he acknowledged saying what was written but attempted to draw a distinction that made little sense, which was that he didn't say "when" he was repairing it.

*Burch's Need to Control at the Risk of Self-Harm*

**{¶ 72}** The significance of Burch's prior incident involving the exercise of control at the risk of self-harm seemed lost in reconciling the testimony. Burch lost control when becoming intoxicated at home. When his wife interceded and called the police, Burch produced a firearm and impulsively threatened that he would commit suicide-by-cop. Burch's irrational behavior led him to threaten his own harm. His harm would be caused not by him, but by someone else. It would be his wife's fault for calling the police. Burch's impulsive behavior was fueled by the need to gain control of a situation even if it required a disregard for his own safety.

**{¶ 73}** Here, Burch was also embroiled with a need to control the situation. Burch took what he thought was a misrepresentation as a personal insult of disrespect for the importance of controlling traffic. He felt empowered to command Nelson to turn around. When Nelson indicated that he had permission to proceed, it was perceived as further disrespect and resistance to Burch's authority. Nelson's indication that Burch was being unreasonable only inflamed Burch's need to exercise control using his authority. When Nelson attempted to proceed around the orange object, Burch had the impulsive and irrational need to stop the truck. Burch ignored the possibility of harming himself.

**{¶ 74}** Impulsive behavior involves conduct that is instantaneous, lacks reflection, and is not thought out. It overlooks the consequences. However, one only needs to draw upon life experiences to understand irrational behavior which overreacts to exercise authority in minor situations. Just as Burch's wife became the victim of Burch's threatened suicide-by-cop because she called the police, so too Nelson became the victim of Burch's irrational attempt for control by exercising authority in what was little more than a situation of minor consequence.

*Conclusion on Nelson's First Assignment of Error*

**{¶ 75}** Too often a manifest weight standard of review becomes similar to the algorithm found in artificial intelligence. But an algorithm is only as good as the scope and depth of information evaluated. Without processing all the necessary information, the well-defined steps in an algorithm produce only rhetorical formalism. This is why the well-defined steps of our manifest weight standard of review must not be reduced to rhetorical formalism.[12] Evidence must be produced that persuasively meets the required weight and should not be affirmed unless it does. That did not occur here. Therefore, I must dissent as it relates to Nelson's first assignment of error.

*Concur in Judgment Only on Nelson's Second Assignment of Error*

**{¶ 76}** As for Nelson's second assignment of error, I disagree with the majority's opinion finding the state was not subject to the speedy-trial timetable applicable to the municipal court case. The majority states in paragraph 42 that "the medical records were not available to the state at the time it filed the municipal court case . . .," thereby rendering the rule announced in *Baker* applicable to the case at bar. However, there is nothing in the record to indicate the state could not have obtained Burch's medical records any sooner than it did. There is also nothing to indicate that the state could not have obtained information about the severity of Burch's injuries from Burch himself. Therefore, unlike the majority, I believe the state should have been charged the additional 25 days appellant asserts are chargeable to the state in the municipal court case. However, just as the majority found, even if we were to add those 25 days back into the speedy-trial timetable, the total speedy trial time attributable to the state would be just 115 days. Accordingly, as Nelson was tried within the applicable 270-day speedy-trial timeframe, I must concur

---

12. "Formalism" has been described as the excessive adherence to outward form at the expense of substantive content. *See, State v. Mansley*, 2nd Dist., 2015-Ohio-2785. This is an expense criminal justice cannot afford.

in judgment only as it relates to appellant's second assignment of error.